I'd like to reserve five minutes if I may for rebuttal. I don't know what the clock is for you, but I assume it's somewhere there where it's visible. There's one right down here. I just wanted to... Does it say 15? Yes, it does. Okay, it'll start counting down. All right. That's it. Your Honor, good morning. I'm Stephen Cox. I represent Lacey Myers, who is now 14 years of age. In 1999, when she was three, living with her parents, Marine Sergeant David Myers and Christina Myers, on Camp Pendleton in the Wire Mountain housing area, the Navy and the Marine Corps at that time was doing a circle of cleanup, a phase of the circle of cleanup at Camp Pendleton. And during the summer of 1999, they dug up 250,000 cubic yards of contaminated dirt from five sites in the outlying areas of Camp Pendleton and dumped that dirt in a landfill that was immediately adjacent to my client's residence and also immediately adjacent to a grammar school. The material that was dumped there was highly toxic. It contained contaminants, principally of heavy metals, including phthalene. The dumping operation, as I said, concluded in November of 1999. In November, Lacey started becoming sick. She lost all of her hair. By March 20th, she had a urinalysis showing that she had ten times the amount of phthalene in her urine as an unexposed adult. Her hair fell out, as I said, a condition known as alopecia. She was diagnosed with peripheral neuropathy and cognitive dysfunction, all classic symptoms of phthalene toxicity. A complaint was filed in July of 2002. And in spite of a preference for cases of this type to get to trial quickly, it took over four years before this matter was ultimately heard. In January of 2006, the district court issued a bifurcation order where he confined the first phase of the trial to the question of the government's negligence under the California's Peculiar Risk Doctrine and under the provisions of the Federal Tort Claims Act. During the trial, the plaintiff presented uncontradicted evidence that the government breached a mandatory duty set up by its own regulation and policy manual, the Safety, Health, and Program Manual issued by the Navy. And there's an acronym that says NAVFAC-ENGCOM, which means the Navy Facility Engineering Command. And in that policy manual, it requires that if you're going to do an environmental cleanup of the type that was done here in order to protect the soldiers and sailors and their dependents and the workers, you have to have a health and safety plan. Does that manual have force of law? Yes, in this case it does. Was it adopted by notice and comments procedures? It was, Your Honor, it was, I'm not absolutely clear. I know that it's mandatory in its language, and it is one that the CIH at the Navy said was mandatory. I understand that, but that's a slightly different question, and that is whether it had the force of law. There are lots of things that are mandatory that don't have the force of law. I'm just trying to figure out the status of the – I mean, could it be perfectly binding on government employees and yet not be enforceable by anybody else because it doesn't have the force of law? Well, I'm not clear about the precise legislative history as to how it was enacted to answer that specific question. I only know that – But that's the violation you claim. The violation you claim is the failure to comply with the manual. There isn't some other duty or standard or regulation or statute out there that's – Well, I think it's both because I think if you are looking at the liability of the government, which has a non-delegable duty to ensure that its contractor is following adequate safety measures, one of the things you look at is a policy manual that the government follows that deals with safety matters. And so whether you're just dealing in the overall general context of whether they actually perform that duty or whether you're looking at the question of whether it's a mandatory duty under force of law is slightly different. But nevertheless, this policy manual absolutely required them to have a CIH, a certified industrial hygienist, review the health and safety plan. And Mr. Cox, the government's never suggested otherwise. Okay, fine. I mean, have they? No, they haven't. And what the government's position was, as I understand it, is that it's mandatory but just not specific enough. And, of course, you disagree with that. I disagree entirely. But they've always conceded that it applies, that it created a duty, and that it was mandatory. Their view is it wasn't specific enough. I think that's correct. And I think that the claim that it wasn't specific enough just doesn't make any sense when you look at the actual language of the policy. And then when you look at the effect of that failure to have a CIH look at the health and safety plan, because it would have been obvious that what we really were getting down to is the perimeter air monitoring plan that is part of the health and safety plan. And that was woefully inadequate. And any CIH who would have looked at that would have said, wait a minute, what are you doing here? Which is what happened when it was finally looked at by a Navy CIH, Commander Field, when he performed his investigation after Lacey got hurt. Counsel, that brings to my question. I take it, I understand your position to be that the manual required a Navy CIH to look at the plan. Yes. Where is the language in the plan that limits the CIH to someone who was Navy personnel? It doesn't appear to me that it specifies that the CIH has to be from the Navy. It's really because of the context of the requirement. But you would agree that it doesn't specify that the CIH has to be from the Navy. Well, in the provision, that 407B does not say that the CIH must be from the Navy. But when you read it in context, these are obligations about what the Navy has to do to ensure that the circle of cleanup is being done in a proper manner. Right. So the Navy could have contracted with the CIH who was not from the Navy. That's correct. If they had hired Bechtel, for instance, all right, Bechtel, I want you to review this health and safety plan. As long as that person met the qualifications. As long as they met the qualifications, and I think more importantly, as long as they were separate from ITOHM, who was the contractor. Well, it doesn't say that. Well, but I think the notion is, it's just like you don't want to rely on British patrolling these days to observe and supervise safety obligations on the deep water horizon. I mean, you don't want the fox guarding the hen house. But if the genesis of the duty you're asserting is from the manual, then you have to stick with what the manual says. You can't deviate from that to make it more stringent. So if the manual says CIH and it doesn't preclude contracting with a person who's employed by the contractor, then your argument doesn't carry much weight. Because you're deviating from the document that you say sets the scope of the duty. I am not deviating from the document. If you read the document and that specific provision in context, it is clear that they're talking about a Navy CIH. It's clear to me. Well, did you read the question? Why don't you read the language? Let's look at it together. What page are we on here? The the language is 420. Let's see. It's a 421. It's paragraph 0407 and C. And it starts out that complete and accurate site health and safety plans are required to prevent exposures to chemical and physical hazards. And then it goes down to C and it says reviews. All health and safety plans shall be reviewed prior to initiating site work by a competent person. Competent person shall mean a certified industrial hygienist or equivalent by training and or experience. And I think that's the language. And you're right. It does not say in there that this must be a Navy person. And it does not exclude someone who is hired by the contractor. It doesn't exclude someone hired by the Navy, but I think the Navy didn't hire anybody to review this. Well, it doesn't exclude the Navy had a contractor. And that contractor had a CIH to perform this function. This language does not exclude that. Well, it's excluded certainly. I apologize. I've got a little frog in my throat here. Get some water. Yeah, I think I'm okay now. You can stop the clock if you need to get some water. Yeah, if you're all right. Stop the clock. Go ahead and get some water. And I think one of the things, Your Honor, that is important here is that the Navy CIH, they had Navy CIHs whose job it was to review the health and safety plans, Janet Corbett and Andrew Bryson. And Janet Corbett testified at the trial, and we asked her specifically, does this provision mean that it must be a Navy CIH? And she said yes. So the Navy had in place two CIHs whose job it was on these circle cleanups to review the health and safety plans. They were supposed to review this one, but it just never got to them.  Now, I know there are cases that say the fact that when the government retains the duty to ensure that the contractor is going to perform adequate safety measures, it's not enough to just put in the contract with the independent contractor to do these safety measures. That doesn't relieve the government of the responsibility to ensure that they do it properly. And when it comes to reviewing the health and safety plan, we went to the people at the government, in the Navy, who did this and took their depositions. And both of them agreed that they had never seen this health and safety plan and that they were the people that would have done it. And had they done it, Janet Corbett said, I would have made notes and put it in my database. And I reviewed my database, and I just didn't do it. That was her conclusion, but her testimony was it's the Navy's responsibility to do this. And, of course, that makes an immense amount of sense, because otherwise you have the fox guarding the hen house, and you have no supervision, meaningful supervision, under those circumstances. So I think it is a mandatory duty. There was a requirement that the CIH review this. The Navy recognized that. They just didn't do it. And that was a breach of duty. And, interestingly, the district court did not even mention this. They didn't talk about this regulation, and they didn't talk about this failure. And he didn't talk about this failure in his order. Either in the earlier ruling on the motion to dismiss or when he flopped after phase one, he never even mentions the manual in connection with the discretionary function exception. That's correct. He doesn't. And in his final order, he doesn't. But for the first three days of the testimony, that's all we were doing, was proving the fact that here's this manual, here are the CIHs at the Navy that should have reviewed it. We put them on the stand and asked them, did you review it? They said no. We went on for two to three days about this. This was a main thrust of our claim. So here we have the order come out three years after that, not even mentioning it. Not even mentioning it. Perhaps the district judge didn't think that what these folks had to say was relevant. Perhaps. I'm not myself convinced that it is. The manual says what the manual says. I agree. It is binding and not binding, or it has the force of law and doesn't have the force of law. And his interpretation doesn't really depend on what a person who happens to be the thing that they should have done something has to say about it. Well, if that was the judge's rationale, where is it in his order? I know why he didn't talk about it, because he had a hard time getting around it intellectually. That's the reason it's not in the order, in my view. You know, if we're to reverse district judges for everything they don't put in their order, it's never a fair case. I understand, Your Honor. And I certainly would not pass it. You're all right. I'm sitting between two current and former district judges, so I will take that. You know, I mean, if the testimony of those officers is all you have, that's a pretty weak read, it seems to me. And I don't know if I wouldn't agree with this. I mean, I know you complain that it took the judge a long time, and I have no ideas about the facts of this case, but the Son of District of California has been, for a very long time, was very short on judges. I don't want to make any excuses, but I don't know that I would have thought it necessary to dispose of this argument that these folks come in and said, you know, we should have done it. I'm just having trouble understanding if that's of any relevance to interpretation of a regulation. I assume it's a manual regulation, whatever it is. It's a policy, an engineering FACCOM policy that they were required to follow. But, Mr. Cox, even if he's not wrong for having failed to discuss the manual, doesn't he err on his bare medicine analysis? Yes. Because he's focusing on the policy considerations and whether or not they should do safety, but they decided to do safety, and then it's the implementation. Yes. And the Ninth Circuit specifically held in bare medicine that once you reach the implementation phase, it's totally outside the discretionary function exception. That's correct. Now, the government has four arguments about why bare medicine doesn't apply, but unless they come up with a fifth, I'm not persuaded. Yeah. I think bare medicine does apply, and the court previously held that bare medicine applied. Well, no. In the summary judgment motion. Motion to dismiss. Motion to dismiss, rather, yeah. That's fine, but that's the second half of your argument. Yes. I thought you were discussing the application of discretionary function exception and the not implementation of the plan, but the adoption of the plan. I just wanted to make sure I was in the right place in the argument. Right. And the question of whether this acquired a, what do we call it, one of these, I forgot the initials, CIH? Yeah, Certified Industrial Hygiene. CIH. The initials floating around. We've got a securities case next. Okay. It's all floating around, right? His acronym's all over. The question of whether the CIH had to be a Navy person is relevant, surely, to the question of whether there was a mandatory duty which would get you out of this discretionary function exception. Yes. Which would go only to the adoption of the plan. It does not ban implementation. That's correct. Okay. That's correct. That's fine. We can move on. We are out of time, but this is an important case. Would you like to take a little time to discuss? The failure to implement. The second question. Yes. There were, basically, you're dealing with the same question, whether it has force of law or otherwise. There was a policy manual that they offered. What has force of law? The health and safety policy manual that required the CIH. The same one here. Yes. The same one here. I thought that process only applied at the time the plan was adopted. This requirement that we've been talking about, I don't see where it has any applicability to the implementation. Am I missing something here? Yes. Yes. Because in the implementing of the health and safety plan, it's first designed by the ICOHM, the contractor, and then it's submitted for review. Had it been reviewed, it wasn't reviewed, and any competent CIH would have looked at that plan and said, your perimeter air monitoring plan is all screwed up for several reasons. And because it was screwed up, what happened is a bad plan went into effect. But even as the bad plan went into effect, there was a perimeter air monitoring plan that was then improperly administered by the contractor. And the government, who had specifically by the federal facilities agreement, had a QAO, a quality assurance officer, appointed whose job it was to see to it that work plans and sampling plans were complied with by the contractor. And in that work plan would have been the perimeter air monitoring plan. He never looked at it. No one from the government ever looked at the perimeter air monitoring data. And the perimeter air monitoring data by the contractor had exceedances of their action level that were never followed through on. So if... You loaded up a lot into what you just said. I'm having trouble understanding. You know, you said it wasn't reviewed and so on. But it seems to me the review of the plan all goes to is not implementation. The review of the plan, approval of the plan, whether somebody else would have looked at it, what they would have done. All of that seems to me is the first part of the argument having to do with adoption of the plan. And then you've got your discretionary function issue there. All right. I want to talk about implementation. Okay.  You have to accept the plan as it is. All right. And say even under the plan as it is, you know, preserving the argument that the plan should be adopted a different way. Or at least this is how I see it. Okay. We accept the plan as it is versus this argument. And here's how implementation was defective. All right. And that's the part I didn't follow at all when you tried this one. The Federal Facilities Agreement required that the Marine Corps and the Navy appoint a project manager and a quality and the Navy appoint a quality assurance officer whose job it was to make sure that the work This was in the plan. This was in the Federal Facilities Agreement. This was the duty that they had. The Federal Facilities Agreement is an agreement between the EPA, the Navy, and the state water quality assurance people and DTSC. And they said, okay, we're going to have all these cleanups. Now, how are we going to make sure it gets done right? And who's going to do what? And they assigned these responsibilities. And the Navy had the responsibility of appointing a quality assurance officer, a fellow named, and the person who it was was a fellow named Nur Zankar. And his duty under the FFA was to ensure that all work plans were properly complied with. And he didn't do that here because in the work plan was Did the district court make any findings regarding the QAO and what he did and didn't do? No. Never mentioned his name. Again. Well, how can we, if the district court didn't make any findings regarding this issue, how can we rule on it? Because the evidence is undisputed that he didn't look at any of the data. There's no contention by the government that Nur Zankar actually went out and looked at any of the data. What was the evidence that was presented to the district court during the trial? Jerry Dunaway, who was the project manager for the Navy, testified that Nur Zankar was the QAO and that Nur Zankar had never gone to the site. Was there a requirement that he go to the site? No, but he had to review, he had to make sure that the perimeter monitoring plan was being employed properly, and he didn't do that. And it's undisputed that he didn't do that. The first time any of the Navy people understood that there had been these exceedances of the air monitoring data was when I was taking their depositions in 2004. They'd never seen it before. Nobody had seen it. And they had an obligation to review it and make sure that it was being properly employed. That was their duty under the FFA. And there's no dispute that they didn't see it. Okay, I thought the QAO was also ensured that work was performed in accordance with the health and safety plan. With the work plan, which includes the health and safety plan, yes. Okay, and so your argument is the health and safety plan required certain air monitoring to be done? Yes. Paragraph 7 of the health and safety plan is air monitoring. Right, but once they did the air monitoring, was there a requirement in there that the QAO determine whether or not the air monitoring was being properly registered? Well, the QAO had a duty to see to it that the health and safety plan was properly administered by the contractor. And that includes, by definition, the permanent air monitoring. Right. Okay, so there was evidence in the record that there were weekly meetings. Right. And so in those meetings, your position is that the QAO did nothing, just sat there and didn't get any reports? He didn't go to them. The project manager went to them. But the data, the permanent air monitoring data showing the exceedances was never discussed at those meetings. Was it ever sent to the QAO? Was there evidence in the record that it was ever sent to the QAO? No, no. And so the district court ignored all of this evidence in your view? Basically, in my view, he ignored it. Basically, and here's the reason he ignored it. What happened is, after bifurcating this case and saying all we're going to try is the Marleyberry issue, what he ended up doing is just deciding in his own mind, well, there really wasn't very much thallium in the dirt, and Lacey couldn't have been poisoned by the thallium. And we can look at after the fact tests that were done to show that there was basically no causation. When he had bifurcated the case and the causation was to be tried later, we were not permitted and did not bring our toxicologist who would have testified that Lacey was poisoned by thallium. The causation was discussed by both parties during the supposed liability phase. Well, certainly it started to creep in when I saw what the judge was doing, but we weren't able to bring our toxicologist. I wanted to bring all of our medical doctors, our treating doctors who had the same. And essentially he can't talk about liability without talking about causation. Without talking about foreseeability, which is a different issue. All right. They're really very close. Well, not if you use foresight rather than hindsight. What he did is he used both. And Mr. Cox isn't the problem with regard to his foreseeability analysis. He really conflated that into a causation issue. Absolutely. And actually I think contrary to what turns out to be a subsequent opinion by the California Supreme Court. But that was, I think, the problem with his foreseeability issue because it really was based on evidence that you would have been able to present in phase two but were never allowed to present in phase one. That's absolutely right. That's what happened. That's what happened. You know, I don't want to infume his intentions, but I felt like we were sandbagged when I saw this order. I couldn't believe that it was so clear that they violated so many provisions of the FFA that their people hadn't done the kind of supervision that had to be done. And because of that, no one ever knew how much and what kind of dust was getting off that site. That's the bottom line. And in order to make sense of that, you needed a toxicologist. And we had one who wrote the seminal paper on thallium toxicity to come in and he's going to say, you know how little thallium is needed for a sensitive person to have the kinds of problems Lacey has? It isn't much. It's extremely toxic. And so the district court starts making these assumptions about not enough thallium without having heard any of that evidence. Okay. All right. Thank you. Thank you. Can it please the court, Kirsten Wilkerson for the United States. What plaintiff's counsel has just been addressing is focusing on the two main claims of alleged negligence, which is the alleged failure to review the site health and safety plan and the alleged failure of the quality assurance officer to carry out his duties under the federal facility agreement. There's been a lot of discussion already about why the district judge didn't go into detail about those two issues in his conclusions of law. The reason he didn't do that is because, first of all, the site health and safety plan was not a document intended to protect nearby receptors, such as the plaintiff. In addition, air monitoring was never viewed by any of the professionals, including all of the regulators. Air monitoring was never viewed as necessary to protect human health. So in addressing what was reasonably foreseeable in light of the risks that were presented, the court concluded that air monitoring just wasn't relevant. Counsel, are you feeding the discretionary function issue? No, Your Honor. Could you address that, please? Yes. There is absolutely no requirement that the certified industrial hygienist who reviews the site health and safety plan be a Navy certified industrial hygienist. It is a provision in a NAVFAC-NCHCOM manual, but it does not specify that the person be a Navy CIH. It is undisputed that the contractor's certified industrial hygienist both reviewed and signed the site health and safety plan. Do you agree that the manual established a mandatory duty for the Navy in this regard? We decided not to really focus on the mandatory provision. In an opening provision of the manual, it refers to guidance, but we focused on the fact that it was not specific enough, because the provision says must be reviewed by a competent person, competent person being a certified industrial hygienist or equivalent by training and experience. That's simply not specific enough. That's an interesting historical fact as to what you thought in the past, but Judge Lawson asked you a question, and I, for one, would like to know the answer to that question. No, it's really not either mandatory or specific. So the government's position is that this is not mandatory. It's not binding on the government. Correct, Your Honor. In addition, there is no evidence that the site health and safety… What is it then? If it's not binding, what is it? It was guidance. So your position is it's just direction to the Navy for best practices on how to do it as opposed to a mandatory obligation. Yes, that was guidance. In addition, there is no evidence that the site health and safety plan was not reviewed by a Navy CIH. The testimony at trial from the remedial project manager for the Navy was that in response to direct question, yes, it was reviewed. Per his practice, he would not have allowed work to begin at the site had the site health and safety plan not been reviewed and accepted. That's right. If he didn't review it, he'd get a poor job. So they decide, the government decides, we've got this toxic waste on this military base, so we're going to remedy the issue by taking it all and dumping it in the backyard of people and next to a school. It's a little weird, don't you think? No, Your Honor. So take it and put it right there where the most vulnerable people are. And that's how we sort of fix things. That's how we remedy toxic hazards. Well, Your Honor, the contaminants that are at issue here, the contaminants that were issued for this remediation, were characterized by all parties to the federal facility agreement, including all three regulators, as presenting low-level threats. Well, obviously they were sufficiently serious that the remediation was thought necessary. I mean, they didn't leave it there in place. And presumably the government doesn't undertake that kind of effort just to spend money. And even the government doesn't waste money like that. So take this stuff that's perfectly harmless and dump it in the backyard of a school, right, where children can play with it. Obviously this was dangerous stuff. The government would not have been remedying, had there been a reason to remediate, unless it were dangerous stuff. Well, dangerous is a broad term. Now, this little girl, according to the evidence in the record, has a level of this dangerous chemical in her body that is 10 times, these evidence shows, 10 times the Vaxone level. Now, that's a lot. How does a little girl get that? That is not what the evidence shows, Your Honor. The level of thallium in the plaintiff's biological samples that were at issue in this case was hotly contested at trial, both by expert witnesses and by the chemist who ran those tests. There were some issues regarding which method of testing was more reliable. There were some issues regarding background interference in the results. But there is evidence of that. Since that issue was never resolved, we have to assume the evidence to be as plaintiff's presented. No, Your Honor. As the winning party at trial, the evidence is construed in favor of the United States. It depends on what you win on. Well, we won on both a no-negligence determination and discretionary function. So even for the no-negligence determination… But you didn't win on causation. Causation was not an issue at trial. In reality, that is really not… You really did not win on a no-harm feeling, that she suffered no damage. No. Okay, so there's nothing in the District Court's opinion that precludes a finding, either a future trial or that precludes a finding that tests showing that, in fact, she had this high level of thymine in her bloodstream, that those were the accurate tests, and, in fact, she did have that. Nothing in the District Court held negates that evidence, right? Yes, Your Honor. Okay, so for purposes of the case, going forward, we have to assume those facts as plaintiffs might have won on if they had had a chance to present that evidence. Yes, Your Honor. Okay, so your dispute about the tests and the like are interesting, but really beside the point. So what I said earlier really is accurate. There is evidence here that still stands that she has this level of thymine that is ten times the background level. How does a little girl get something like that? And aren't military personnel who serve their country entitled to have their benevolent government take better care of avoiding this kind of hazard to their families? Yes, Your Honor, but to find the United States negligent because there is some evidence of a higher than background level in the plaintiff's biological samples would be tantamount to holding the United States strictly liable. And we cannot be held strictly liable. We can only be held negligent. And in this case, to determine negligence, the focus has to be on what was foreseeable at the time. And again, every professional involved did not consider there to be a foreseeable risk to human health from thallium exposure and fugitive dust. Had the EPA considered that to be a risk, the remedial project manager for the EPA testified, EPA would have required air monitoring. EPA did not require air monitoring. The air monitoring is only in a site health and safety plan. That is not a document EPA or any regulator has the ability to enforce. Had EPA thought it was necessary, air monitoring would have been included in some of the documents it can enforce, such as the remedial design, remedial action plan. And, for example, that plan... This goes to foreseeability? Yes, Your Honor. Okay. And that was something that was taught in phase one. Yes. Foreseeability. Yes. And the remedial design, remedial action plan specifically says, with respect to how nearby receptors, such as the plaintiff, are to be protected, nearby residents would be protected from safety hazards by restricting access to the site. This is not a situation where no one considered the risk to the nearby receptors and residents. They did consider those risks, but those foreseeable risks had more to do with the heavy machinery that was being used on site or that someone could get on the site and injure themselves in a hole that had been dug. What about the implementation? So they say, well, they adopt this plan, they have these procedures in place, and they dispute whether they're adequate or not. But there is evidence in this record that the plan was non-compliant in material respects. There wasn't watering down of the dust on a regular basis, and there were other violations of the plan. What do you make of those? The evidence at trial showed that the plan was followed. There was regular watering down of dust. The evidence at trial showed that the regulators, who always had a responsibility for protecting human health, and under the Federal Facility Agreement, they were also responsible on a daily basis for the work going on at the site. They were periodically at the site. None of them ever saw a problem with dust control at the site or raised any concern to that nature. In addition, the allegations that the site health and safety plan and air monitoring were not followed, did not support it in the record. The gentleman who was on site for the contractor, Mr. Hubbard, testified. Initially, he testified, yes, he was told not to follow the plan. But in follow-up testimony, he clearly stated, no, what he was supposed to do was look around the site when there were exceedances. And if those exceedances were a result of the remediation work taking place, then he was supposed to stop the work if they could not bring the levels down. But because of the marine layer that exists here, it was determined that they would often have exceedances when the exceedances were not related to the work being done at the site at all. Ms. Wilkerson, can I change gears a little bit? You're not disputing that thallium is a very dangerous substance. It is a toxic substance, yes. And a matter of fact, CERCLA has labeled it a hazardous substance, and the Clean Water Act, it's a toxic pollutant, right? Correct. And the government banned it in 1972 by executive order as a rodicide or a rodenticide. Yes. Yeah, I didn't say it correctly, but you know what I mean. Rodenticide? Yes, thank you. So it's a very dangerous substance. It is toxic, yes, at certain concentrations. Now— That's something one would want to sprinkle on cereal, right? No, Your Honor, but— Do you know what its nicknames are? I'm sorry? Do you know what thallium's nicknames are? The poisoner's poison and inheritance powder. And I cite for that Wikipedia, not exactly a hugely reliable source. And Agatha Christie has written about thallium poisoning, and it was a CSI episode. It's got a long history in literature. But what's important here to remember is that they were bringing contamination from remote sites at the base to Black Canyon Landfill for the remediation. Thallium was not found at all five of those sites. In fact, it was only found at two of those sites, and it was in low concentration. And that was—there was lots of evidence to that fact at trial. And the trial judge's view of the evidence came in, and his determination of credibility of the various witnesses who testified to that issue should be given credibility. But that's a causation question. It's not a causation question, Your Honor. In fact, it was plaintiffs during pretrial who requested that some of the evidence the court is viewing as causation come in. Some of the evidence that was referred to with respect to the testing of the soil is testing that was done prior to the remediation, and that was done to characterize the soils, the contaminations, and that informed the risk that was present. And what was determined was that they were very low-level risks. So in keeping— Let me get back to something you talked about earlier. Is it the government's position that on the site there were no material deviations from the plan? Yes, Your Honor. There is no evidence in the record that the plan was violated. Again, what was required—although there were over 200 exceedances here, that did not mean that the plan was violated. Let me try to understand. I thought—and you probably know what I'm saying in this class, so you can correct me if I'm misstating this— but I thought that they were doing monitoring, and when there were exceedances, they would stop the work. They would do something about it. They wouldn't keep going when there were exceedances. Am I mistaken about that? Doesn't the plan require that? There was the original plan, and then there were two amendments to the plan. And what was in place during most of the work was the second amendment to the Site Health and Safety Air Monitoring Plan. And under that plan, I believe—I don't want to state the wrong level. It was either .5—I think it was .5. They were to stop, look around, and try to determine the source of the dust causing those exceedances. And if the source was determined to be unrelated to the remediation work, then work could resume. And the source often was due to the marine layer that exists in this area. But again, what— Wait, wait, wait. So did they do that? Yes, Your Honor. Did they stop work and determine the source every time? We—you know, honestly, we didn't ask about every time at trial, but there is no evidence that the plan was not complied with. Again, Kevin Hubbard did say initially, yes, I was told not to follow the plan. But what happened was—and this is borne out in the testimony from both Mr. Kevin Hubbard and the certified industrial hygienist for the contractor, Fred Malachar. The contractor determined that they were to look around the site, determine the source, and if the source had nothing to do with the remediation, they should continue. And this air monitoring was something that the contractor imposed upon itself. The Navy was only concerned about dust from a prior remediation in 1996, and they'd gotten complaints about dust from the residents nearby. So in 1999, the remediation had that issue. In this case, the Navy said to its contractor, we don't want to hear complaints from our residents about dust. Make sure you keep it down. Do whatever you need to to do that. So the contractor implemented the air monitoring plan. The air monitoring was a secondary dust control measure. The primary method of controlling dust was the workers on site using their own eyes to see what was going on. And again, air monitoring was not necessary to protect human health. And the threat was so low that the contractor certified industrial hygienist didn't require the workers on site to wear any kind of respiratory protection, not even the kind of painter's dust mask you might wear if you were doing work at your house. And those workers on the site never used that kind of protection. So we had very low level risk. I'm sorry, guys. I hope not. I just found this to be a sort of ridiculous argument. Well, you know, we must have been right because, look, we had our own workers exposed to the same danger. Well, I do think that's highly relevant. I think that's highly relevant, Your Honor. The contractor had a vested interest in protecting its workers. And those people are right on the site. If anyone's going to get a strong dose. You mean it owned the workers? It had a vested interest? Well. You mean you've never heard of workers suing their employer because their employer hasn't been careful enough of their safety? It happens. It happens, but, you know, it's certainly not something that the contractor wanted to happen. They never wanted to happen. Well, they also wanted to save money and they wanted to make a profit in the contract and all those things. Often they do very foolish things. They take foolish risks for the safety of their own workers and the safety of people around because they figure by the time the dust cycle, so to speak, they'll be out of town. Well, in this case, Your Honor, the certified industrial hygienist for the contractor actually performed some very detailed calculations to determine what the risk would be to his workers on site. And, in fact, for the first few days of the remediation, he had the workers wear monitors on their clothing. He took the data from that and analyzed it and determined that there really was no risk to be prevented by air monitoring. That doesn't tell you much, though, because they're hauling stuff from all over, right? And so the first few days it could be bringing stuff from one area that doesn't have thallium, and then two weeks later they're bringing it from a different location, and the fact that you're no longer wearing those monitors, you know, could be highly contaminated and you have no proof at all until one of the workers confesses and loads some disease, right? And that could be delayed years. Well, Your Honor, the monitoring that was done here was not monitoring for constituents or level of contamination here. It was monitoring for dust. And that was not a mistake. That was not an oops in hindsight. We should have done something different. That was the plan all along. And, again, the regulators who are responsible... What's this plan? I'm having a little hard time figuring this out. So the government decides you've got this contaminated stuff in the remote areas of the base, and what they're going to do is when they're all hauled together, they'll dump it in the backyard of the school because that's safer. And we're not going to monitor for the stuff that we are remediating, the dangerous, toxic stuff that we are spending all this money to haul off and bury in order to avoid toxic hazard. We're only going to look for dust. I'm having a little problem following here why this is the same strategy. It's the same way to proceed. If this were happening in my backyard, I would hope they would do a lot better. And if I knew this was happening in my backyard, I would go to court and try to stop it. Your Honor, the risk is all dependent on what the contaminants are. And as the EPA testified at trial, these were non-volatile compounds. Volatile compounds are those that are known to rise up and travel by air. Being non-volatile compounds, heavy metals, which were known to bind to the soil, were not readily transported by air. So all of the professionals involved and all of the regulators involved at the time that the work was planned and carried out, no one foresaw a risk to human health from thallium floating up in the air and moving off-site as part of fugitive dust. It simply wasn't a foreseeable risk. So they don't monitor for it? I'm sorry, Judge? So they don't monitor for it? There was no need. If the professionals involved did not foresee a risk, then there was no need to perform air monitoring. And again, yes, air monitoring was performed, but it was performed as a secondary dust control measure. Now, the foreseeing part is itself... I mean, you could be wrong about that, right? I mean, you can have all of your experts there, and they don't foresee it, and it turns out they should have foreseen it. Is that something that's subject to the discretionary function exception? Well, is that an implementation that simply a state-taught... That is not relevant to discretionary function, Your Honor, no. So how do we assess the conduct of, or the district court's ruling on the conduct of these folks who made the decision not to monitor for these toxic compounds? Now, you're sure that it's heavy metals and so on, but, you know, having said that, I don't think any of us here in this courtroom would want to go out and breathe that stuff. I mean, I think if we knew what was going on out there, we would try to avoid crossing the street. That's the reality. So let's say all those folks were wrong. They often are. Sometimes they are. How is that judged? How do we judge that? For discretionary function, Your Honor? No, you said this is not for the discretionary function. Well, for the negligence determination, then, even if all of those professionals and all of those regulators were wrong, you still have to go to... It has been known to happen. It has been known to happen, Your Honor, but for a negligence determination, what has to be at the heart of a negligence determination is what was reasonably foreseeable. To look at, in hindsight, and say, oh, actually, they were wrong and someone was harmed, then you're liable. That would be holding the United States strictly liable. And we cannot be held strictly liable. We can only be held negligent. And the negligence determination has to turn on what was reasonably foreseeable in light of what was known about the level of harm that was prevented. And, in addition, once the trial court addressed the level of harm that was presented and that it was low-level threats, the court then turned to looking at what the United States did to ensure its contractor took adequate safety precautions. And the evidence at trial was that the United States did act appropriately to ensure that those safety precautions were taken. In this case, the United States had contractual provisions that required... That's actually the question I was asking. This is what made the determination that the government took adequate safety precautions. How do we review that? How much difference... Oh, I'm sorry, Your Honor. That determination by the trial court must be reviewed for clear error. And, in this case, there is... It's a factual determination as far as you're concerned. Yes, Your Honor. And there is ample evidence in the record to support the trial court's determination on that issue. Once the trial court determined that, then he went on to address what the United States did. And, in this case, the United States had detailed contractual provisions requiring its contractor to enhance safety. For example, the contractor had to have its own safety program and its own quality control program. In addition, this is not a case where the United States stepped back from safety. The United States directly monitored the safety precautions of its contractor in a number of ways. We had the remedial project managers from both the Navy and the Marine Corps on site on a regular basis. In addition, they reviewed the contractor's planning documents.  And the first thing on the agenda at those meetings was health and safety. In addition, the contractor submitted monthly reports to the Navy, and the Navy evaluated the contractor on a regular basis on issues including project safety. So, in this case, we had low-level threats, and in light of those low-level threats, the United States took appropriate measures to ensure that its contractor took adequate safety precautions at the site. If I could turn briefly to the two specific issues of alleged negligence by the plaintiffs. There is no evidence, again, that the site health and safety plan was not reviewed by a Navy CIH. Although it's not required, there is no evidence that that was not done. The evidence at trial was that Jan Corbett did not have a record of that review. Now, by the time this plan came through, Ms. Corbett was no longer with the safety office. She had moved into another office. She had become the head of acquisition and housing. But because of her expertise, she still assisted in reviewing some site health and safety plans. But she only reviewed about 60 plans a year, whereas Mr. Bryson, who was still in the safety office, he reviewed about 1,200. And Mr. Bryson did testify in his deposition, which was designated for trial, that he did not have a review, or I'm sorry, a record of this review, and that if it was something that he reviewed in conjunction with Ms. Corbett, there might be a record in a database or CD-ROM that she had set up. But there was simply no record of this. But that does not equate to the site health and safety plan not being reviewed by the Navy, especially in light of the remedial project manager's testimony that, yes, the plan was reviewed. He would not have allowed work to proceed otherwise. Counsel, the problem is that the findings of the district court don't include any of those factors you just discussed regarding the CIH. And the reason for that, Your Honor, is that error monitoring simply was not foreseen as being necessary to protect human health, and that's what that issue is. But a trial, though, if there was evidence presented of the breach of the duty that centered on the CIH, it would stand to reason that the district court would consider the evidence on both sides and make a finding of facts and a conclusion of law that addressed if that was the focus of the claim. Why is that missing from the findings? It's missing in the detail the plaintiff wants to see it in. And with respect to plaintiff's allegations... Well, show me in the opinion. Your Honor, at excerpt of record... Do you know what my question is? I'm sorry, you're just going to repeat the same question. I apologize, Your Honor. Would you show me in the record where the district court discussed the specific allegation that the Navy CIHs did not review the plaintiff? He did not specifically address that in the court's findings of facts and conclusions of law. But the issue as to whether he found the facts specially enough or not really had been waived by plaintiff. That's an issue that plaintiff did not raise until the reply brief. And plaintiff's statement in her opening brief that the court ignored evidence was not sufficient to put the United States on notice that we needed to brief that issue. Well, here's the difficulty for me, you know, as a reviewing judge. If I read this opinion, I don't know how the court, regardless of whether the plaintiff briefed this or not, I can't tell from this opinion how the district court weighed the evidence that was presented by the parties. It's very difficult to tell what evidence was persuasive to the court and what evidence was not persuasive to the court when the court doesn't address it at all. So in order for us to review the findings of fact, we have to determine whether or not the findings of fact are clearly erroneous. If there's nothing there, we have nothing to review on this very pivotal point. Your Honor, this was a very complicated case, both factually, scientifically, and in terms of the expert evidence put on. The United States findings of fact and conclusions of law exceeded 100 pages. To require the district judge to have addressed every little point, and what plaintiff thinks was a star and highlighted trial may not have been something that the district judge thought was central to the case. Every little point. I mean, I've had bench trials before, and I mean, if an issue is a pivotal issue for the plaintiff, in my view, it's incumbent upon the district court at least to say, you know, I heard this evidence, it wasn't persuasive. It doesn't have to be every little point, but at least some acknowledgement that this evidence was presented, and I considered it, and the plaintiff is less credible or more credible, and here's how I rule it. Otherwise, we can't review it. Well, Your Honor, it is clear from the court's order that he did consider air monitoring. At Excerpt of Record 30, the court said there was no danger to be prevented from air monitoring. So he did consider the evidence with respect to air monitoring, but it seems clear to me from reading the court's order in its entirety that he considered air monitoring, but gave more credence to the United States evidence that air monitoring was not necessary to protect human health, because in light of the detailed foreseeability analysis that the court performed, air monitoring was not viewed as necessary to protect human health. Very quickly, with respect to the quality assurance officer's duties, the quality assurance officer did satisfy his duties under the Federal Facility Agreement. He did that by reviewing the contractor's plan prior to work beginning. He was not required to be in the field, and he was not required to review the contractor's data. There was testimony from a number of Navy employees who knew the quality assurance officer quite well and knew his duties, and he was not supposed to look at data after the fact. Plaintiff had decoded the quality assurance officer, but elected not to call him at trial. So for plaintiff now to object to that. How do you assure policy without checking the data? I'm having a little trouble seeing. That goes back to the fact that the Navy required the contractor, its very experienced contractor, to have its own quality control plan. And in the record, I'm sorry, supplemental excerpts of records 782 and 787, that specifically delineates what quality assurance role was retained by the Navy, being the quality assurance officer, and what was delegated to the contractor under the Quality Contractor Quality Control Program. So reviewing data and being out in the field was something that was delegated to the contractor under that Contractor Quality Control Plan. The Navy, just as it had, just as it did with review. And did the contractor comply with that? There's every evidence that the contractor did, Your Honor. There's no evidence to the contrary. It looks like the contractor had not complied with the plan. Would the United States be off the hook for, if it delegates that responsibility to a contractor, does the United States get off the hook for if the contractor does not perform the review? That would depend on what the United States did to ensure that the contractor took adequate safety precautions and complied with the duties designated to it. And, again, in this case, the United States took appropriate steps to ensure that the contractor complied. The only time that the United States saw... What were those appropriate steps? I'm sorry, Your Honor. What were those appropriate steps? That goes back to the fact that the remedial project managers were on site periodically. The Navy had weekly quality control meetings with the contractor at which health and safety was first on the agenda. The Navy employees, being the remedial project managers and the resident officers in charge, performed spot checks of the work being done at the site. And the contractor was required to submit monthly reports to the Navy, and the Navy periodically evaluated the contractor on safety. With respect to the quality assurance officer specifically, again, he was not required to review data. And no one thought this was necessary, and that's why, although there were all of these exceedances, the contractor never thought to bring them to the Navy because, in the contractor's view, they didn't represent any risk to human health. And this is not a case of letting the fox guard the hen house, as plaintiff's counseless bond is saying, and just having the fox kind of run around and do whatever it wanted to. This was a very experienced, reliable contractor. And, in fact, early on in the work, the contractor did bring a concern about dust control to the Navy. There was a concern about dust control out at one of the remote sites, and the contractor did bring that concern to the Navy. So the United States appropriately relied on this very experienced contractor to handle the low-level risk at the site and to control dust for nuisance value. Okay, thank you. I want you to take a couple minutes, and we'll come back over to you. I'm sorry. You can take two minutes. All right. Thank you. That's all I need. Counsel said that the EPA didn't require air monitoring. This was all a low-level risk. It really wasn't a big deal. We were just worried about nuisance dust. We really weren't worried about contaminants getting off site. I'm reading now from Section 7 of the Health and Safety Plan that was signed off by the government and by the EPA because they had to review these and accept them before they went forward. The Health and Safety Plan under air monitoring states, Ambient air monitoring will be conducted as necessary in order to determine airborne contamination levels. This ensures that respiratory protection is adequate to protect personnel against the chemicals that are encountered, as well as assuring that harmful levels of airborne contaminants are not leaving the site. For the EPA and for the government to stand up here and say, oh, it was a low level and nobody anticipated it was going to get off the site, the document that they approved contemplated that this was a danger, and that's the reason they had perimeter air monitoring. Secondly, as the district court stated in the ruling on the motion to dismiss, this is an inherently dangerous situation. The government can't contend otherwise, and the reason it's inherently dangerous is because you've got all this contaminated material being dumped right next to base housing and a school. And the government said, you're right, we agree to that. And now they're saying it wasn't dangerous. That flip-flop just doesn't fly, especially if you're looking at the concept of foreseeability. When they found these exceedances, the remedy was, if it lasts more than an hour, find the cause of the dust and have extra suppression methods. If it goes on more than that, you've got to stop the job. It's undisputed the job was never stopped. On numerous occasions in those 265 exceedances, they were over the limit all day long. All day long. And so for them to say that, oh, well- And that evidence was presented to the district court during the trial? Yes, it was. And the district court didn't make any mention of that in the opinion one way or the other? He did not deal with the exceedances. He did not deal with the fact that they didn't shut the job down. What he did was he went into this sort of causation argument that the government brought to him, which is that the EPA and everybody else doesn't think it was a big deal and there was no need to have air monitoring, even though they had air monitoring, even though they required it. And so that's where he went with it. He didn't deal with it specifically. Also, the other part of this Mr. Hubbard, who was the ITOHM employee who was told not to follow the plan, and God knows that's what happened. The plan wasn't followed. Another part of it, and an important part of it, was the plan called for a total dust action level. And what that means is you've got to measure all of the dust. And what is clear is all they measured was PM10, which is respirable dust, dust that's from 1 to 10 microns in diameter. Dust 15, 17, 20 was not measured. And none of it was speciated, which means you catch the dust, you put it to a lab, you find out what's actually getting off site. That's what they should have done. That's what they did in 1996. That's what they did in 2000. That's what they should have done here. And that's one of the reasons this plan was so inadequate. Had they speciated, they would have known what was going off site. That wasn't required by the plan? Yes. Speciation? Well, no, no, it wasn't. But it should have been because they were calling for a total dust action level. And you can't, first of all, you have to collect all the dust. You have to measure all the dust. And then what all of the CIHs involved say is if you're going to do that, what should have been done here is they should have speciated the dust, which is what they did in 2000. It's what they did in 1996, but they didn't do it here. Isn't that a best practices argument, though? Well, yeah, I think it is the best practices argument. But isn't negligence a function of either complying or not complying with what are best practices? Negligence doesn't require the use of best practices, but of reasonable. Yeah, but when you're talking about an area like certified industrial hygiene, you're talking about, like doctors, it's standard of care issues. You've got to do it the way a competent CIH would do it. And the way a competent CIH would do it is require speciation and would require total dust. And that's what Dan Fields, who was the CIH from the Navy, said in his memo that's part of the record, that March 16, 2000 memo. You look at that, and he criticized this plan for the same reason that my CIH criticized it. So we don't know because the district court did not address any of this. So we don't know what the district court's finding would have been on any of those items. I think that's accurate. Okay. Thank you, Anne. Thank you, Scott. You're most welcome.
judges: Aldrich, Bennett, Kozinski